UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:

TIMOTHY WARREN BOYDSTUN,
    Debtor.                                                                               No. 7-11-12456 TR

TIMOTHY WARREN BOYDSTUN,
    Plaintiff,

v.                                                                                       Adv. No. 12-1193 T

JOY GALEY,
    Defendant.

JOY GALEY,
    Plaintiff,

v.                                                                                       Adv. No. 12-1298 T

TIMOTHY WARREN BOYDSTUN,
    Defendant.

## MEMORANDUM OPINION

The above-captioned adversary proceedings involve the same parties and were tried together on August 23, 2013. Galey seeks to have Boydstun's debt declared nondischargeable under 11 U.S.C. § 523(a) and to revoke his discharge under 11 U.S.C. § 727(d)(1). Boydstun seeks damages for Galey's alleged violation of the automatic stay. This is a core matter. For the reasons set forth below, the Court will deny all requested relief.

## I. FACTS

The Court finds the following facts:

1. Galey and Boydstun have a long-standing, unhappy relationship. They had a son together in 1974 and lost touch sometime thereafter.

2. In 2001, Galey purchased a home in Yermo, CA (the "California House"). She obtained a loan to purchase the home, which she paid off in 2003.

3. Galey contacted Boydstun through a mutual acquaintance in 2005 or 2006, and the couple reconciled.

4. On April 4, 2007, Galey conveyed her interest in the California House to herself and Boydstun as joint tenants.

5. A few months later, Boydstun obtained a loan for approximately $65,000, secured by a mortgage on the California House.

6. In October, 2007, Boydstun obtained a second loan from Vandyk Mortgage Corporation for $95,400, secured by a mortgage on the California House.

7. Galey was aware of and consented to the loans. Boydstun and Galey planned to use the proceeds to purchase a house in New Mexico and start a business.

8. Escrow closed on the second loan on November 8, 2007. Most of the proceeds were used to pay off the first loan. The net proceeds (about $20,850) were deposited into the couple's joint account at 1st National Bank. Boydstun and/or Galey then transferred $31,000 to Boydstun's separate account at Bank of America.

9. Around the same time, Boydstun purchased a mobile home and lot in Lovington, New Mexico (the "Lovington House") for approximately $39,500. Boydstun used the funds from the joint account ($31,000), along with about $8,500 of his own money, to buy the house.

-2-

10. Galey helped Boydstun complete the paperwork required by the U.S. Department of Housing and Urban Development ("HUD").

11. Galey and Boydstun moved into the Lovington House shortly after the sale closed.

12. Around that time, Boydstun and Galey attempted to buy an RV park in Lovington. Galey applied for a tax identification number from New Mexico Taxation and Revenue Department ("NMTRD") for a business called "T & J RV Park." The purchase never occurred, and their other efforts to buy or start a business failed.

13. Boydstun conveyed his interest in the Lovington House to himself and Galey as joint tenants on February 11, 2008.

14. Boydstun and Galey conveyed their interest in the Lovington House back to Boydstun on November 22, 2008. Galey signed the deed featured in Exhibit 1 (the "Quitclaim Deed") in the presence of her daughter, Kelli Marquez, a Notary Public (Robert Perez), and Boydstun.

15. Because of her poor credit, Galey signed the Quitclaim Deed so Boydstun could get a loan secured by the Lovington House.

16. In March or May, 2009, Boydstun obtained a loan from New Day Financial, LLC for approximately $56,000, secured by a mortgage on the Lovington House.

17. Boydstun and Galey used the loan proceeds to pay personal expenses.

18. Boydstun also purchased a vehicle for Marquez, who was unable to obtain financing.

19. In 2010, the relationship between Galey and Boydston began to sour.

20. Galey moved back to California in May, 2010. She or Marquez took various financial documents belonging to Boydstun back to the California House.

21. On April 20, 2011, Boydstun conveyed his interest in the California House to Galey.

22. Boydstun filed the above-captioned bankruptcy case on May 26, 2011 (the "Petition Date").

23. Galey learned about Boydstun's bankruptcy case in late May or early June, 2011. She then contacted the Bankruptcy Court and determined she was not listed as a creditor.

24. Galey filed a lawsuit against Boydstun in California on June 20, 2011.

25. The Chapter 7 Trustee (the "Trustee") conducted the first meeting of creditors on July 19, 2011.

26. Galey obtained a recording of that meeting shortly thereafter.

27. Galey contacted the Chapter 7 Trustee several times between June and August, 2011 to complain that Boydstun lied on his schedules and at the § 341 meeting. Boydstun met with the Trustee on four occasions to furnish additional documents. Neither the Trustee nor the United States Trustee pursued the matter further.

28. On August 20, 2011, Galey sent a letter to the Court objecting to discharge/ dischargeability.

29. On September 8, 2011, the Court's staff sent Galey a letter informing her that the objection must be filed as a separate adversary proceeding. The letter highlighted the September 19, 2011 deadline for objecting to discharge/dischargeability.

30. Boydstun received a discharge on September 26, 2011.

31. On October 4, 2012, Galey filed a report with the Lovington Police Department claiming that she did not sign the Quitclaim Deed. The police department sent the Quitclaim Deed to the FBI for a handwriting analysis. Neither agency pursued an action against Boydstun.

32. Boydstun filed a complaint against Galey for violating the automatic stay on May 22, 2012.

33. Galey filed a complaint objecting to discharge/dischargeability on October 12, 2012.

## II. DISCUSSION

A. Revocation of discharge under § 727(d)(1).

11 U.S.C. § 727(d)(1) allows a court to revoke a discharge if it "was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge." To prevail on a claim under § 727(d)(1), the movant must prove by a preponderance of the evidence that: (1) the discharge was obtained through fraud; (2) the movant did not discover the fraud until after the discharge was granted; and (3) the fraud, if known, would have prevented the discharge under § 727(a). *Lawrence National Bank v. Edmonds (In re Edmonds),* 924 F.2d 176, 180 (10th Cir. 1991) ("To revoke a discharge under § 727(d), the debtor must have committed a fraud in fact which would have barred the discharge had the fraud been known."); *In re Matos,* 2008 WL 596744, at *3 (11th Cir. 2008) (identifying the required factors under § 727(d)(1)). In general, "[r]evocation of a debtor's discharge is an extraordinary remedy." *Smith v. Jordan (In re Jordan),* 521 F.3d 430, 433 (4th Cir. 2008). § 727(d) must therefore be "construed strictly against the party seeking revocation and liberally in the debtor's favor." *Id.*

As an initial matter, Galey's complaint under § 727(d)(1) is untimely. Such actions must be brought within one year after the discharge is granted. 11 U.S.C. § 727(e)(1); *Zedan v. Habash,* 529 F.3d 398, 401 (7th Cir. 2008); *Citibank N.A. v. Emery (In re Emery)*, 132 F.3d 892, 897 (2d Cir.1998). Boydstun received a discharge on September 26, 2011, and Galey filed her complaint on October 12, 2012.

Further, Galey's § 727(d)(1) claim fails on the merits. Galey alleges that Boydstun lied on his schedules and during the § 341 meeting, in violation of §§ 727(a)(2) and (a)(4). There is

-5-

some evidence that Boydstun's schedules were incorrect. However, to the extent any fraud existed, it is clear Galey knew about the fraud long before the discharge was granted. Galey was intimately familiar with Boydstun's financial condition when the case was filed. In the summer of 2011, Galey reviewed Boydstun's statements and schedules and repeatedly contacted the Trustee to report his alleged fraudulent conduct. Galey therefore had the necessary information to file a complaint under § 727(a) before the deadline. Instead of filing an adversary proceeding by the deadline - which the Court's staff advised her to do - Galey waited approximately 13 months to act. Consequently, Galey cannot maintain a claim under § 727(d)(1). *See, e.g., AmBank v. Suelflow (In re Suelflow),* 2009 WL 2913073, at *4 (Bankr. D.N.M. 2009) (declining to revoke debtor's discharge where movant "had reason to know of [debtor's] fraud prior to … discharge and failed to exercise reasonable diligence to investigate its claims").

  B. Nondischargeability under § 523(a)(6).

Debts arising from "willful and malicious injury by the debtor to another entity or to the property of another entity" are excepted from the general discharge. 11 U.S.C. § 523(a)(6). Claims under § 523(a)(6) require proof that the injury was both willful and malicious. *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir.2004). To constitute a willful act under § 523(a)(6), the debtor must "desire ... [to cause] the consequences of his act or ... believe [that] the consequences are substantially certain to result from it." *Moore*, 357 F.3d at 1129 (citations and internal quotations omitted). The "malicious" component of § 523(a)(6) requires an "intentional, wrongful act, done without justification or excuse." *Fletcher v. Deerman (In re Deerman),* 482 B.R. 344, 369 n.18 (Bankr. D.N.M. 2012) (collecting cases). The movant "bears the burden of establishing nondischargeability by a preponderance of the evidence." *Id.*

Like her § 727(d)(1) claim, Galey's nondischargeability claim is untimely. Where the movant knows about the bankruptcy case, such claims must generally be brought within 60 days of the first date set for the § 341 meeting. *Maslar v. Martin (In re Martin),* 468 B.R. 479, 486 (Bankr. D. Mass. 2012) ("Pursuant to Fed.R.Bankr.P. 4007(c), an objection to the dischargeability … must be filed within 60 days after the first date set for the § 341 meeting."); *Muir v. McWilliams (In re Muir),* 2013 WL 4447027, at *2 (Bankr. S.D. Ind. 2013) (same). The § 341 meeting was originally set for July 19, 2011; Galey filed her complaint over a year later. Nevertheless, the Court will address the merits of Galey's claims.

    1.    <u>The California House</u>.

Galey points to various injuries under § 523(a)(6). First, she contends that Boydstun encumbered the California House without her consent. Neither Boydstun nor Galey were particularly credible on this issue. Based on the trial evidence, however, the Court believes that Galey was aware of, and did not object to, the loans. At the time, the couple had a joint account and shared expenses. Galey helped Boydstun complete the necessary HUD paperwork to buy the Lovington House, which was purchased with the net loan proceeds secured by the California House. Galey also applied for a tax identification number for a business bearing the pair's initials, "T & J RV Park." Although Boydstun and Galey intended to use the loans for joint ventures, their plans never materialized. Instead, it appears the funds were used to buy the Lovington House and to supplement the couple's income for several years. During this time, Galey did not work, and Boydstun received government benefits. Galey's son lived in the California House rent-free. Galey and/or her son allowed the California House to fall into significant disrepair. Unfortunate as events turned out, Boydstun's conduct was not willful or malicious as required by § 523(a)(6).

2. The Quitclaim Deed.

Galey also asserts that Boydstun or an agent acting at his direction forged her signature on the Quitclaim Deed to eliminate her interest in the Lovington House. The Court is not convinced that occurred. Both Boydstun and the Notary Public, Robert Perez, testified that Galey signed the deed. Perez checked Galey's ID to confirm that she was the signatory. Aside from transacting business on one or two occasions, Boydstun does not have any relationship with Perez. Galey's daughter - Kelli Marquez - told police that she witnessed Galey sign the Quitclaim Deed. Although the police and the FBI investigated the matter, neither agency pursued an action against Boydstun. Further, to an untrained eye the signature on the Quitclaim Deed appears to match the signatures on Galey's pleadings. In reality, Galey had bad credit, and Boydstun took title to their joint property for the purpose of obtaining financing. In light of the evidence, the Court finds that Galey signed the Quitclaim Deed. To the extent her § 523(a)(6) claim is based on Boystun's alleged forgery, Galey did not carry her burden of proof.

3. Boydstun's Invective Behavior.

Next, Galey argues that Boydstun was abusive and gave her an incurable sexually transmitted disease. There is no conclusive, admissible evidence that either party has the disease in question. Even if there were, the Court cannot determine which party caused the alleged injury. The parties have been dating intermittently for roughly 40 years, during which time they could have encountered other infected partners. The Court therefore cannot award damages based on this argument.

The Court is sensitive to the fact that Boydstun and Galey had a tumultuous - and by all accounts, miserable - relationship. However, it is unclear whether, and to what extent, Boydstun was abusive. The only evidence on that issue was Galey's testimony, which unfortunately was

not credible. Further, Galey failed to offer evidence regarding the amount of damages she suffered as a result of the alleged abuse. Without such evidence, Galey cannot prevail on her claim under § 523(a)(6). *See, e.g., Zhao-Ding v. Lauzon (In re Lauzon),* 2012 WL 1192800, *11 (Bankr. D. Mass. 2012) (declining to declare certain debts nondischargeable under § 523(a)(6) where, though it appeared that the debtor engaged in misconduct, plaintiffs failed to offer sufficient evidence regarding damages).

        4.      <u>Miscellaneous Fraud</u>.

Finally, Galey points to several other alleged injuries caused by Boydstun's fraudulent conduct. Among other things, she contends that Boydstun: (1) defrauded CitiMortgage by pretending to be an active duty military member; and (2) required Galey to pay for weatherization work on the Lovington House without her consent. These arguments fail. Galey participated in the alleged scheme to defraud CitiMortgage, and she ordered the weatherization work herself. In any event, to prevail on a claim under § 523(a)(6), the *movant* must suffer the injury. *See, e.g., Davis v. Olson (In re Olson),* 454 B.R. 466, 478 (Bankr. W.D. Mo. 2011) ("§ 523(a)(6) means that the debtor targeted the [movant] to suffer the harm resulting from the debtor's intentional, tortious act."). Galey cannot bring an § 523(a) claim on behalf of third parties.

Based on the foregoing, the Court declines to declare any of Boydstun's debt nondischargeable under § 523(a)(6).[1]

C.      <u>Willful Stay Violation - § 362(k)</u>.

A debtor injured by a "willful" violation of the automatic stay is entitled to recover damages, including costs, fees, and if appropriate, punitive damages. 11 U.S.C. § 362(k)(1). To

---

[1] It is difficult to tell whether Galey only intended to bring claims under § 523(a)(6). To the extent she intended to bring claims under §§ 523(a)(2) or (a)(4), the Court concludes that she has not carried her burden of proof under either of those subsections.

-9-

prevail under § 362(k), the debtor must prove by a preponderance of the evidence that: "(1) a violation occurred; (2) the violation was committed willfully; and (3) the violation caused actual damages." *Kline v. Deutsche Bank Nat'l Trust Co. (In re Kline),* 472 B.R. 98, 103 (10th Cir. BAP 2012). A violation is willful "if the creditor knew of the automatic stay and intended the actions that constituted the violation." *Kline,* 472 B.R. at 103 ("The term 'willful' refers to the deliberateness of the conduct, coupled with knowledge of the filing."). Although a party's subjective understanding of the automatic stay may be relevant to damages, it is not relevant to whether a willful violation actually occurred. *Culley v. Castleberry (In re Culley),* 2006 WL 2091199, at *4 (10th Cir. BAP 2006). If a party has knowledge of the pending bankruptcy case, they are charged with knowledge of the automatic stay. *In re Radcliffe*, 563 F.3d 627, 631 (7th Cir.2009) ("A willful violation does not require specific intent to violate the stay; it is sufficient that the creditor takes questionable action despite the awareness of a pending bankruptcy proceeding."); *KCH Services, Inc., v. Nordam Group, Inc.*, 345 B.R. 542, 548 n. 5 (W.D.N.C. 2006) (same); *cf Zilog v. Corning (In re Zilog),* 450 F.3d 996, 1008 (9th Cir. 2006).

Here, Galey knew about the bankruptcy case when she filed a lawsuit against Boydstun. She did not believe the automatic stay applied to her because Boydstun did not list her as a creditor. Despite this misunderstanding, her conduct likely rises to the level of "willful" for purposes of § 362(k). *See, e.g., Culley,* 2006 WL 2091199, *5 (affirming a finding that the *pro se* creditor willfully violated the discharge injunction where he did not fully understand the nature of the injunction); *In re Thompson,* 426 B.R. 759, 764 (Bankr. N.D. Ill. 2010) (A "good faith mistake of law … [does not] relieve a willful violator of the consequences of his act").

Nevertheless, Boydstun cannot prevail under § 362(k) because he failed prove that the violation caused actual damages. In his complaint, Boydstun sought $175,000 in damages. At

-10-

trial, he testified that he sustained approximately $15,000 in actual damages. Boydstun, however, did not offer sufficient testimony or other evidence to support this amount. The Court therefore cannot award actual damages in this particular case. Further, as Galey did not understand the nature of the automatic stay, punitive damages are not appropriate.

### III. CONCLUSION

All requested relief is denied. This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law under Fed.R.Bankr.P. 7052. An appropriate judgment will be entered in each case.

/s/ David T. Thuma
Honorable David T. Thuma
United States Bankruptcy Judge

Entered on: September 13, 2013

Copies to:

Joy Galey
P.O. Box 101
Barstow, CA 92312-0101

Glen L. Houston
1304 W. Broadway Pl.
Hobbs, NM 88240-5508